UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PREMIER FLOOR CARE INC., <br><br> Plaintiff, <br><br> v. <br><br> SERVICE EMPLOYEES INTERNATIONAL UNION, UNITED SERVICE WORKERS WEST, <br><br> Defendant. | Case No. 18-cv-01851-HSG <br><br> **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. No. 60 |

Pending before the Court is the motion for summary judgment brought by Defendant Service Employees International Union, United Service Workers West ("SEIU" or the "Union"). Dkt. No. 60 ("Mot."). The Court held a hearing on Defendant's motion on June 13, 2019. Because the Court finds that there is a genuine dispute of material fact as to whether SEIU's labor activity was prohibited under § 8(b)(4)(ii)(B) and whether that activity caused Plaintiff Premier Floor Care, Inc. ("Premier") to lose its contract with Safeway, Inc. ("Safeway"), the Court **DENIES** Defendant's motion for summary judgment.

**I. BACKGROUND**

The Court briefly recounts the facts viewed in the light most favorable to Premier, the nonmoving party, as it must at the summary judgment stage. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

**A. Premier's Relationship with Safeway**

Premier brings this action against SEIU for violation of the secondary picketing provision in § 8(b)(4) of the National Labor Relations Act ("NLRA"). Premier is a contractor that provides

commercial floor care services to supermarket stores, such as Safeway. Dkt. No. 70-17, Declaration of Cedric Moore ("Moore Decl.") ¶ 4. Premier has been one of Safeway's janitorial contractors since 2001 and generally has had a good working relationship with Safeway. Moore Decl. ¶¶ 5–8; *see also* Dkt. No. 70-22, Ex. E; Dkt. No. 70-23, Ex. F.[1] Starting around July 2017, Safeway began soliciting bids from contractors to perform janitorial services. Dkt. No. 61-4, Ex. 4, Declaration of Stephanie Evans ("Evans Decl.")[2] ¶ 3; Dkt. No. 61-14, Ex. 14. Premier participated in the first round of bidding and was selected to move forward and participate in the second round in October 2017. Evans Decl. ¶ 4. At that time, Safeway was contemplating providing Premier two districts to service. Dkt. No. 61-30, Ex. 30. However, Premier was not informed of, nor invited to join, the third round of bidding. Moore Decl. ¶ 15.

Nick Hines, Manager of Labor for Safeway Northern California stores, noted that Safeway could save $2,200,000 if it decided to replace Premier with King Janitorial Equipment ("King"), one of Premier's competitors. Dkt. No. 61-32, Ex. 32. But despite Premier not being the lowest bidder, Mr. Hines believed "Premier is a good company and we have headaches, but they do a good job." *Id.* Notwithstanding the cost, Mr. Hines said Safeway could still balance the overspend in some of the districts Premier would service. *Id.* However, in February 2018, King ultimately was awarded the contract to service multiple Northern California Safeway stores. Evans Decl. ¶ 7. Safeway terminated its contract with Premier, which Premier alleges resulted in a net lost income of approximately $5,500,000. Moore Decl. ¶ 17.

### B. Dispute Between SEIU and Premier

In September 2016, SEIU invited Premier to renegotiate the Safeway Contractors' Agreement, which expired in 2015. Dkt. No. 61-15, Ex. 15 at PFC000153. King had agreed to renegotiate with SEIU and was able to reach an agreement. *Id.* at PFC000165. Although Sanford

---

[1] All references to numbered exhibits are attached to the Declarations of Caroline N. Cohen, Dkt. Nos. 61, 71-1, 72-1, and all references to lettered exhibits are attached to the Declaration of Patrick W. Jordan, Dkt. No. 70-1, Declaration of Jose Sanchez, Dkt. No. 70-15, and Declaration of Cedric Moore, Dkt. No. 70-17.

[2] Ms. Evans is Albertsons's Manager of National Programs, Floor Care. Evans Decl. ¶ 1. Safeway is a wholly owned subsidiary of Albertsons, and Ms. Evans managed the bidding process for Safeway during 2017–2018. *Id.* ¶¶ 1–3.

1 Rudnick, a labor consultant negotiating on behalf of Premier, and Pedro Malave, a coordinator at
2 SEIU, attempted to come together and bargain, Premier and SEIU were unable to settle on an
3 agreement. *Id*. at PFC000205–213. Because Mr. Malave felt that Mr. Rudnick was refusing to
4 bargain, he told Mr. Rudnick that he would be filing an unfair labor practice claim ("ULP") and
5 "starting actions at all Premier sites." *Id*. at PFC000208.

On August 9, 2017, Mr. Malave sent Ms. Evans an email notifying her of the dispute between SEIU and Premier. Dkt. No. 61-18, Ex. 18. He also informed her that SEIU was not having issues with contractors such as King and others that "have an interest in bidding for the account at Safeway." *Id*. Based on this information, Mr. Malave hoped "Safeway [could] reconsider their current relationship with Premier." *Id*.

### C. SEIU's Labor Activities

Negotiations between SEIU and Premier completely broke down by fall of 2017, and SEIU began demonstrations against Premier in November 2017 at Safeway sites. During one of the demonstrations on November 22, 2017, SEIU members went to a Safeway store that Premier was servicing. The members carried bullhorns, drums, and noisemakers, and were given T-shirts and fliers. Dkt. No. 70-15, Ex. N, Declaration of Jose Sanchez ("Sanchez Decl.") ¶¶ 9–11. The fliers informed readers that Premier had not agreed to adopt the new union contract and was not negotiating fairly, and that the members were asking patrons for their support. Dkt. No. 61-24, Ex. 24. ("Please tell the Store Manager here that you support good working conditions for the Janitors, and that PREMIER FLOOR CARE should negotiate fairly and agree to the wage and benefits improvements that other companies have already adopted"). A footnote at the bottom of the flier clarified that "SEIU-USWW has a dispute with Premier Floor Care and not with any other employer at this location." *Id*.

There were approximately 40 to 100 participants at the demonstration. *See* Dkt. No. 61-19, Ex. 19; Sanchez Decl. ¶ 9. Jose Sanchez, a participant at the demonstration, heard the SEIU leader, Alan Gallegos, say the purpose of the activity was "to get Premier out of Safeway stores and get King in" because Premier would not "sign the Union contract." *Id*. ¶ 11. The members, wearing their T-shirts, first crowded in front of the store and eventually marched inside and

surrounded the perimeter. Dkt. No. 61-19, Ex. 19; Dkt. No. 61-20, Ex. 20; *see also* Sanchez Decl. ¶ 10. They proceeded to chant, yell, and bang the drums, apparently scaring Safeway customers. Sanchez Decl. ¶ 13; Dkt. No. 61-19, Ex. 19 ("They marched in the store around the perimeter of the store using the bull horn and drums scaring customers.") The Safeway Store Director called the police to "contain [the Union members] to one area where they were not making it impossible for customers to shop." Dkt. No. 61-19, Ex. 19. Similar events occurred on or around November 30, 2017, and December 7, 2017, at different Safeway locations. Sanchez Decl. ¶¶ 18–20.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). If a court finds that there is no genuine dispute of material fact as to only a single claim or defense or as to part of a claim or defense, it may enter partial summary judgment. Fed. R. Civ. P. 56(a).

With respect to summary judgment procedure, the moving party always bears both the ultimate burden of persuasion and the initial burden of producing those portions of the pleadings, discovery, and affidavits that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will not bear the burden of proof on an issue at trial, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Where the moving party will bear the

burden of proof on an issue at trial, it must also show that no reasonable trier of fact could not find in its favor. *Celotex*, 477 U.S. at 325. In either case, the movant "may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." *Nissan Fire*, 210 F.3d at 1105. "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03.

"If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586. A nonmoving party must also "identify with reasonable particularity the evidence that precludes summary judgment," because the duty of the courts is not to "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If a nonmoving party fails to produce evidence that supports its claim or defense, courts must enter summary judgment in favor of the movant. *Celotex*, 477 U.S. at 323.

### III. DISCUSSION

SEIU contends that summary judgment must be granted because there is no genuine dispute of material fact that: (1) SEIU engaged in lawful labor activity, and (2) Safeway's decision to terminate Premier's contract was not a result of SEIU's activity. Mot. at 1.

The parties are reminded that this order does not constitute findings of fact or a prediction of how a jury might assess the evidence at trial. Rather, because SEIU has moved for summary judgment, this order evaluates whether there are genuine disputes of material fact that preclude SEIU from obtaining judgment as a matter of law. *See Tolan*, 572 U.S. at 565 (counseling that the "judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial") (quotations omitted).

#### A. Evidentiary Objections

In its reply brief, SEIU makes various evidentiary objections, including objections to evidence of events occurring before February 2017 and labor activities that were not expressly mentioned in Premier's complaint. Dkt. No. 71 ("Reply"). According to SEIU, these represent

5

"new claims" and "new theories" that Premier cannot now introduce. SEIU also objects to declarations that are allegedly "contradictory to other sworn deposition testimony" and on hearsay grounds. Reply at 3–5, 7–9.

"To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001); *see also Chartis Specialty Ins. Co. v. Aqua Scis. Engineers, Inc.*, No. 11-CV-03669-JST, 2013 WL 4647288, at *3 (N.D. Cal. Aug. 29, 2013) ("The Court's focus at summary judgment is not on the form of the evidence submitted, but on whether its content would be admissible."). Objections at the summary judgment stage should be focused on the "admissibility of its contents," and not "the admissibility of the evidence's form." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

Rule 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). For example, "hearsay evidence attached to an affidavit may be considered at summary judgment if the out-of-court declarant could present the evidence through direct, admissible testimony at trial." *Chartis*, 2013 WL 4647288, at *3 (citing *Fraser*, 342 F.3d at 1036).

SEIU's objections are misguided and not appropriate at this stage of the litigation. Premier's evidence on its pre-2017 relationship with Safeway and SEIU does not constitute "new claims" or "new theories" that the Court cannot examine. *See* Reply at 11–12. Instead, this evidence is relevant context that the Court must consider when drawing all reasonable inferences in favor of Premier. The Court also disagrees that Premier's evidence regarding the December 7, 2017 labor activity represents an inappropriate "new claim" or "new theory." *See* Reply at 7–9. Premier's complaint alleges that SEIU "engaged in a series of illegal acts" starting "on or about November 2017 and continuing thereafter." Compl. ¶ 8. December 7, 2017 clearly falls into a "series" of acts alleged to have continued after November 2017. And to the extent the Court relies on declarations in this order, it has only considered testimony and evidence that is based on the

6

declarant's personal knowledge. At the summary judgment stage, the Court may not weigh the evidence or make credibility determinations. *Freeman*, 125 F.3d at 735.

### B. National Labor Relations Act § 8(b)(4)

Under § 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187, a plaintiff may bring a private cause of action for damages resulting from "any activity or conduct defined as unfair labor practice in Section 8(b)(4) of the National Labor Relations Act." 29 U.S.C. § 187. Section 8(b)(4) of the NLRA, codified as 29 U.S.C. § 158(b)(4), prohibits certain types of unfair labor practices by labor organizations. At issue here is § 8(b)(4)(ii)(B), which makes it unlawful for a union or its agents:

> (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--
>
> …
>
> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing[.]

29 U.S.C. § 158(b)(4)(ii). Section 8(b)(4)(ii)(B) essentially prohibits certain types of "secondary boycotting" and was prompted by Congressional concern over pressure on third parties not involved in the relevant labor dispute, while recognizing the need to protect labor organizations' "right to exert legitimate pressure aimed at the employer with whom there is a primary dispute." *N.L.R.B. v. Local 825, Int'l Union of Operating Eng'rs, AFL-CIO*, 400 U.S. 297, 303 (1971).[3]

To allege that a defendant violated § 8(b)(4)(ii)(B), a plaintiff must establish that the labor

---

[3] The Supreme Court has established that the NLRA preempts state and federal court jurisdiction to remedy conduct "arguably subject to § 7 or § 8 of the Act." *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp. of Am. v. Lockridge*, 403 U.S. 274, 284 (1971). However, Congress has expressly provided a federal cause of action for parties claiming a violation under § 8(b)(4), and therefore this Court has jurisdiction to hear this case. *See id.* at 313; 29 U.S.C. § 187(b).

7

organization: (1) "'threaten[ed], coerce[d], or restrain[ed]' a person engaged in commerce (such as a customer walking into one of the secondary businesses)," and (2) the organization did so "with 'an object' of 'forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the produces of any other producer, processor, or manufacturer, or to cease doing business with any other person.'" *Overstreet v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, 409 F.3d 1199, 1212 (9th Cir. 2005) (citation omitted). The Supreme Court noted that the terms "threaten, coerce, or restrain" are "nonspecific, indeed vague," but "more than mere persuasion is necessary." *DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 578 (1988) (quotations omitted). In light of First Amendment considerations, these terms should be "interpreted with caution and not given a broad sweep." *Id*.

The activity itself is not *per se* determinative of whether the conduct is prohibited—that is, not all picketing is automatically prohibited. Rather, the statute only prohibits activity that "persuade[s] the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer." *N. L. R. B. v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 63 (1964). Congress did not intend to "prohibit all consumer picketing at a secondary site," as "the [legislative] history shows that Congress was following its usual practice of legislating against peaceful picketing only to curb 'isolated evils.'" *Id*. at 71. "The only activity that appears to be clearly proscribed by the statute is '*ambulatory* picketing' of secondary businesses," which is when picketers walk in a line and create a symbolic barrier. *Overstreet*, 409 F.3d at 121 (quoting *DeBartolo*, 485 U.S. at 587).

In *DeBartolo*, the Supreme Court held that a union's distribution of handbills at the entrances of a shopping mall was not threatening, coercing, or restraining under § 8(b)(4)(ii)(B), as there had been "no violence, picketing, patrolling, or other intimidating conduct, [ ] only an attempt to persuade customers not to shop in the mall." *DeBartolo*, 485 U.S. 578–79. Based on *DeBartolo*, the Ninth Circuit in *Overstreet* held that placing banners on public sidewalks, when the banners do not block entrances to businesses or otherwise promote any "physical confrontations" between union members and patrons, do not come within the ambit of § 8(b)(4)(ii)(B). *Overstreet*, 409 F.3d at 1214. The Ninth Circuit found persuasive that the

8

1  bannering activity was "stationary" as opposed to "ambulatory," and the union members did not

2  "initiate any verbal or physical interactions with the public." *Id*. There were no physical barriers

3  blocking walkways or entrances, "no taunting, no massing of a large number of people, [and] no

4  following of the [r]etailers' patrons." *Id*. at 1211.

### i. Whether SEIU's Conduct Was Threatening, Restraining, or Coercive

SEIU contends that Premier's evidence does not show any use of picket signs or the blockage of entrances or exits, but instead only the use of "leaflets, union t-shirts, megaphones and drums and chanting/singing by SEIU-USWW and its members at the labor action." Mot. at 18–19. SEIU also asserts that its labor activities did not discourage Safeway patrons from entering the store, or encourage Safeway employees to cease working. *Id*. at 19. Therefore, SEIU argues that its actions were not prohibited under § 8(b)(4)(ii)(B). *Id*. Premier posits that SEIU's activities were coercive under § 8(b)(4)(ii)(B) because the evidence shows that SEIU members were physically blocking customers and Safeway employees from freely moving around in the Safeway store. Dkt. No. 70 ("Opp.") at 16.

Based on the Court's review of the relevant evidence and drawing all inferences in favor of Premier, the nonmoving party, the Court finds that there is a genuine dispute of material fact as to whether SEIU's conduct at the sites was "coercive." The Court, in light of First Amendment considerations, focuses on the conduct of the SEIU members and not on the content of their speech. *See DeBartolo*, 485 U.S. at 580 ("picketing is 'a mixture of conduct and communication' and the conduct element 'often provides the most persuasive deterrent to third persons about to enter a business establishment'") (citation omitted); *see also Kohn v. Sw. Reg'l Council of Carpenters*, 289 F. Supp. 2d 1155, 1167 (C.D. Cal. 2003). SEIU's own evidence establishes that its members' conduct is distinguishable from the activity the Ninth Circuit held was permitted in *Overstreet*. In contrast to *Overstreet*, in this case, there were physical barriers in front of the store and confrontations with customers and employees through chants and shouts. *Cf. Overstreet*, 409 F.3d at 1202 (members "placed the banners at a significant distance—scores if not hundreds of feet—away from the Retailers' entrances. [ ] At no point did the [members] block the entrances to the Retailers or directly confront individual customers of those businesses through chants, shouts

9

or any other means."). Instead of staying "stationary and quiet," *see id.*, SEIU members came to the Safeway store with bullhorns, drums, and signs, marched into the store, and surrounded the perimeter. Dkt. No. 61-19, Ex. 19; *see also* Dkt. No. 70-15, Ex. N, Sanchez Decl. ¶ 10. Photographs show a long line of Union members with T-shirts crowded in front of the Safeway store, a reasonable inference being that the members were blocking the entrance or walkways to the entrance. Dkt. No. 61-20, Ex. 20. The members entered the store in four-person lines and made a "complete circle" inside, blocking the aisles. Dkt. No. 70-15, Ex. N, Sanchez Decl. ¶¶ 13–14. They used bullhorns and drums inside the store and reportedly scared customers. Dkt. No. 61-19, Ex 19. The Safeway Store Director had to call the police to "contain [the Union members] to one area where they were not making it impossible for customers to shop." *Id*. If proven, the described conduct is demonstrably unlike the peaceful bannering in *Overstreet*.

The Court therefore finds that it is reasonably in dispute whether SEIU members were shouting, blocking entrances, or otherwise acting aggressively so as to violate the NLRA.

### ii. Whether SEIU Engaged in the Coercive Activity With "An Object" of Forcing Safeway to Cease Doing Business With Premier

The second element under § 8(b)(4)(ii)(B) is whether the "object" of the labor activity was to bring "indirect pressure on the primary employer by involving neutral or secondary employers and their employees." *N. L. R. B. v. N. California Dist. Council of Hod Carriers & Common Laborers of Am., AFL-CIO*, 389 F.2d 721, 725 (9th Cir. 1968). If the activity was "directed only at the employer with whom the union has a bona fide labor dispute, then it may be lawful even though some neutral or secondary employees might be affected." *Id*. Premier argues that the evidence shows SEIU's intent was to pressure Premier into signing a new agreement, and if Premier refused, SEIU would pressure Safeway to cease business with Premier. Opp. at 18. SEIU claims that Premier did not produce enough evidence to support its contention that the objective of SEIU's labor activity was to coerce Safeway into terminating its contract with Premier. Mot. at 15–17.

The Court finds that there is a reasonable inference that the object of SEIU's labor activity was to put pressure on Safeway to curtail its business with Premier. SEIU's arguments are

misplaced, as it conflates the elements under § 8(b)(4)(B)(ii). SEIU focuses on whether the *words* of Mr. Malave's statements before the demonstrations were threatening or coercive, but the relevant inquiry is whether the *conduct* during the demonstrations was coercive and done with the purpose of pressuring Safeway into ceasing business with Premier. Premier alleges that Mr. Malave's words are evidence of that intent, and the Court finds this interpretation reasonable, viewing the evidence in the light most favorable to Premier. *See* Dkt. No. 61-15, Ex. 15 at PCF000251 ("Since you are refusing to bargain I am filing a ULP and we are starting actions at all Premier sites."); Sanchez Decl. ¶ 11. Mr. Malave had emailed Ms. Evans cautioning that Safeway should reconsider its relationship with Premier, and informed her that SEIU did not have issues with the other contractors bidding for an account at Safeway. Dkt. No. 61-18, Ex. 18. SEIU does not offer any other alternative interpretation, simply asserting that Mr. Malave's statements are "a statement of future acts." Mot. at 19. The Court does not find that this weakens the reasonable inference that SEIU's intent was to pressure Safeway, and at the very least, the record gives rise to a genuine dispute as to this material issue.

### C. Causation Under LMRA § 303

To recover damages under § 303 of the LMRA, it is not enough for Premier to show that SEIU violated § 8(b)(4)(ii)(B). Premier also must establish that it was "injured in [its] business or property by reason of" SEIU's alleged violation: in other words, that SEIU's unlawful labor activity caused Premier to lose its business with Safeway. *See Mead v. Retail Clerks Int'l Ass'n, Local Union No. 839, AFL-CIO*, 523 F.2d 1371, 1376 (9th Cir. 1975).[4] To establish causation under § 303, plaintiff must show that the conduct "'materially contributed' to the injury, or was a 'substantial factor' in bringing it about, 'notwithstanding other factors contributed also.'" *Id*. at 1376–77 (citations omitted). A plaintiff does not have to establish the injury with certainty: it is sufficient if the evidence supported a "just and reasonable inference" that the plaintiff was

---

[4] SEIU argues that *Mead* is inapplicable and that the Court instead should rely on an out-of-circuit case. Reply at 10. The Court disagrees. Although the question in *Mead* was whether a primary employer injured by a primary picket line could recover under § 303, the Ninth Circuit articulated the standard for what an aggrieved party must show to prove that its injury was "by reason of" a § 8(b)(4) violation. *Mead*, 523 F.2d 1371 at 1376–79. That is the exact inquiry here.

11

damaged by the union's action. *Id*. at 1377 (quotation and citations omitted).

SEIU offers evidence that Safeway's decision to terminate Premier was based on cost savings. Mot. at 20–23; Dkt. No. 61-4, Ex. 4, Evans Decl. ¶ 4; Dkt. No. 61-32, Ex. 32. Premier argues that it has presented enough circumstantial evidence to create a genuine dispute of fact. Opp. at 19–24. Based on the record, the Court agrees with Premier and cannot say at this stage that, as a matter of law, there was no causal connection between SEIU's proscribed conduct and the loss of Premier's contract with Safeway.

Premier offers evidence that before the labor activities in November 2017 began, they had a good relationship with Safeway and were being considered for two of the Northern California Safeway sites. Moore Decl. ¶¶ 5–8; Dkt. No. 61-30, Ex. 30. There is also evidence that Mr. Hines thought of Premier as a "good company," although one that gave him "headaches." Dkt. No. 61-32, Ex. 32. While Mr. Hines testified during his deposition that "headaches" referred to "[n]ormal operations of floor care" and not the demonstrations, Dkt. No. 61-6, Ex. 6, Deposition of Nicholas Hines at 70:1–16, prior SEIU demonstrations in 2015 had raised concerns with Mr. Hines. Dkt. No. 70-26, Ex. I ("Please let me know when [the SEIU protest] is resolved as it has gone all the way to our CEO. I am getting the heat."); Dkt. No. 70-27, Ex. J (Mr. Hines informing Premier that "[w]e have the union picketing our location in Dublin because of you. … This is not our issue to resolve."). Viewing the facts in Premier's favor at this stage, it is a reasonable inference that Mr. Hines was concerned about the demonstrations, and that those demonstrations were factors in Safeway's decision not to reward Premier any contracts.

Further, it was important to Safeway that the contractors had a relationship with SEIU, and SEIU evidently made it clear to Safeway that SEIU and Premier did not have a good rapport. *See* Dkt. No. 70-7, Ex. F. That Mr. Malave contacted Ms. Evans directly to notify her of SEIU's grievances with Premier supports the reasonable inference that Ms. Evans may have been aware of and taken into consideration the recent demonstrations when making Safeway's final decision. *See* Dkt. No. 61-18, Ex. 18. Although her declaration states that she does not recall receiving emails from Mr. Malave, Dkt. No. 61-4, Ex. 4, Evans Decl. ¶ 5, credibility and weight determinations are for the fact finder at trial.

SEIU is correct that the evidence presented is circumstantial, but the Court is "entitled to infer from [ ] circumstantial evidence that the necessary causal relation between the [Union's] conduct and the claim damage existed." *See Mead*, 523 F.3d at 1378. And while cost certainly appears to have been a factor in Safeway's decision, the question at summary judgment is not which party presents more or weightier evidence, but "whether there is a genuine issue for trial." *Tolan*, 572 U.S. at 565. Premier has done more than "simply show that there is some metaphysical doubt as to the material facts." *See Matsushita Elec.*, 475 U.S. at 586. The evidence, viewed in the light most favorable to Premier, demonstrates that there is at least a dispute of material fact as to whether SEIU's allegedly unlawful conduct was a material or substantial factor that caused Safeway not to award Premier any contracts.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

Dated: 6/27/2019

HAYWOOD S. GILLIAM, JR.
United States District Judge

13